**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION**

**JOSHUA S. FRIEBEL** and
**ELIZABETH F. FRIEBEL**,
Husband and wife,

        Plaintiffs,

v.                                       Case No.: 5:10cv120/RS-MD

**PARADISE SHORES OF BAY COUNTY,
LLC,** a Florida limited liability company;
**ROBERT E. BLACKERBY**, an individual
**MAGNUM CAPITAL, LLC**, a Florida limited
liability company; **DURDEN ENTERPRISES
II, INC.**, a Delaware corporation, **DURDEN
ENTERPRISES, LLC**, a Florida limited
liability company, **ESTATE OF KEDRICK
EARL DURDEN, MICHAEL EARL DURDEN
as PERSONAL REPRESENTATIVE OF THE
ESTATE OF KEDRICK EARL DURDEN,
MH I, Limited Liability Company**, a Florida
limited liability company,

        Defendants.

_____/

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs **JOSHUA S. FRIEBEL** and **ELIZABETH F. FRIEBEL**, by and

through the undersigned attorney, pursuant to Rule 56, F.R.C.P., file their Motion for

Summary Judgment against Defendants **PARADISE SHORES OF BAY COUNTY,**

**LLC, ROBERT E. BLACKERBY**, **MAGNUM CAPITAL, LLC**, **MH I, limited**

**liability company, MICHAEL EARL DURDEN as PERSONAL REPRESENTATIVE**

**OF THE ESTATE OF KEDRICK EARL DURDEN,** and **DURDEN ENTERPRISES II,**

**INC.** on the following Counts:

## I.      SUMMARY JUDGMENT COUNTS AGAINST DEFENDANTS

**Count I:**      **Failure to Disclose** – by all referenced Defendants for failure to disclose all facts materially affecting the value of Plaintiffs' Unit 204 (the "Unit") and the Paradise Shores project (the "Project").

**Count II:**      **Fraudulent Concealment** – by all referenced Defendants by concealing all facts materially affecting the value of Plaintiffs' Unit and the Project.

**Count III:**      **Fraudulent Misrepresentation by Omission** – by all Defendants.

**Count IV:**      **Negligent Misrepresentation** – by all referenced Defendants for not disclosing facts materially affecting the value of the Unit and the Project.

**Count V:**      **Negligence** – by all referenced Defendants for not disclosing facts materially affecting the value of the Unit and the Project.

**Count VI:**      **Gross Negligence -** by all referenced Defendants for not disclosing facts materially affecting the value of the Unit and the Project and their reckless disregard.

**Count VII:**      **Breach of Contract** – Defendant Paradise Shores of Bay County, LLC.

**Count XI:**      **Rescission**.

### FACTS AND LAW IN SUPPORT OF SUMMARY JUDGMENT

## II.      BACKGROUND

This lawsuit arises out of a condominium project developed by Defendants Paradise Shores of Bay County, LLC, Robert E. Blackerby and Magnum Capital, LLC.   At all times referenced herein and in the Complaint, all of the Defendants were owners, officers, members, managers and agents of the developers.    No one else was in charge of this development other than Robert Blackerby and his companies Magnum Capital, LLC and

MH I, limited liability company, and Kedrick Earl Durden and his companies Durden Enterprises, LLC and Durden Enterprises II, Inc. (formerly known as Rail Management Corporation – which was also the lender of the Project).  Robert Blackerby and Kedrick Earl Durden, and their companies, developed the Project and sold the Unit.

The Prospectus to the Project, Deposition testimony, and numerous exhibits filed with this Motion show that Defendants Paradise Shores of Bay County, LLC, Robert Blackerby, and Magnum Capital, LLC were the developers of the Unit and the Project.   As developers of the Unit and the Project, Defendants had a duty to Plaintiffs to disclose all facts materially affecting the value of Plaintiffs' Unit 204 (the "Unit") and the Paradise Shore project (the "Project").  Case law cited in this Motion will show that the owners of these developer corporations and LLC's also had a duty to disclose and therefore should be held personally liable for their tortuous acts alleged in the Complaint and in this Motion.

Defendant Durden Enterprises II, Inc., owned by Kedrick Earl Durden, financed the Project, and made decisions to not fix defects and deficiencies at the Project in order to save money and expedite completion of the Project.  The Material Facts and Exhibits filed by Plaintiffs show that the Project was way behind schedule and the Defendants rushed to get it finished to keep from losing buyers pursuant to the two (2) year completion deadline. Defendants were in such a hurry to get things moving that a representative from Magnum Capital submitted an unapproved boilerplate structural plan letter to Bay County to get the ball rolling.   The plan was not for this Project.   Deposition testimony of the threshold inspector shows that this should have never been submitted to the County, was a boilerplate letter and not a structural plan, and definitely was not approved by the threshold inspector.

3

The exhibits also show that the Project was subject to numerous design, structural and construction defects and deficiencies; that the general contractor had never constructed a condo complex before (GAC Contractors was a parking lot contractor); that Defendants went to great lengths to cover up the defects and deficiencies; that Durden and Blackerby were present at all meetings regarding the deficiencies and were copied on all correspondence and emails; that the Defendants paid to cover up a lot of the deficiencies with "band-aid" type fixes with caulk and paint, and "far-fetched" unproven methods; that the threshold inspector never signed off on the building as being structurally sound, never signed off the building as being completed, and Defendants eventually fired them; that Defendants falsified inspection reports; Defendants fired their waterproofing contractor despite the continued and worsening problem of mold and water intrusion; Defendants closed on the Unit with Plaintiffs even though the structural engineer had not signed off on the Project; and that the Defendants were instructed to disclose material facts, even by their attorneys, and never did.

**Plaintiffs closed on their Unit on June 19, 2007.** Some of the material facts, defects and deficiencies that were <u>not disclosed prior to Plaintiffs closing on the Unit</u> (a complete list is found in Plaintiffs' Material Facts and Exhibits), and are still present at the Project today, are as follows:

    a.      Undisclosed defects in the building's foundation:
            a.      Foundation piles did not meet specifications. See Exhibit 32-36.
            b.      Soil densities did not meet code for foundation. See Exhibit 37-38.
            c.      Foundation deliberately poured on non-compliant soil. See Exhibit 37-38.
            d.      Foundation certification never accomplished. See Exhibit 35-36.

    b.      Undisclosed structural damage that occurred during construction:
            a.      Entire building settled as if it was about to collapse. See Exhibit 39

     b.      Structural cracks observed throughout building. See Exhibit 41-42
     c.      Unlevel floors throughout building. See Exhibit 40
     d.      Overstress so severe that its foundation deflected. See Exhibit 40
     e.      Deflections exceeded code throughout building. See Exhibit 75.

c.     Undisclosed structural errors that occurred during construction:
     a.  Missing rebar throughout building. See Exhibit 17 and 54
     b.  Exposed and corroding rebar throughout building. See Exhibit 62-66
     c.  Significant damage to 3rd floor structural slab. See Exhibits 82-83.
     d.  40,000+ pounds of steel plates were bolted to the elevated concrete floors to structurally reinforce building. See Exhibit 58-60.
     e.  6000+ holes for bolts were drilled through the floors for the steel plates damaging electrical, HVAC, fire protection system. See Exhibit 179-204.
     f.  The Project's structural engineer refused to certify the building. See Exhibit 102-105.

d.     Undisclosed concerns with the structural integrity of the building:
     a.      Concerns regarding thinness of the structural floor slabs. See Exhibit 71
     b.      Concern with long-term deflection of elevated floors. See Exhibit 71
     c.  Problems with the experimental design of the steel plate retrofit implemented on the building. See Exhibit 60, 84-93.
     d.      Concerns with long-term problems with building. See Exhibit 90-91.

e.     Undisclosed building code violations:
     a.      Permit obtained via unauthorized threshold plan. See Exhibit 207-208
     b.      Final threshold inspection was never accomplished. See Exhibit 207-211.
     c.      Building has never been signed off as complete. See Exhibit 207-211.
     d.  Last threshold report shows missing bolts, column defects and structural reinforcement plate defects that were never corrected. See Exhibit 207-211
     e.      Deflections in the elevated slabs exceed code. See Exhibit 75-81
     f.      Project does not meet flood elevation requirements. See Exhibit 226-231.
     g.  Height of Project exceeds city's height limitation. See Exhibit 16 at page 8, and Exhibit 265.
     h.      Trash chute vent does not meet Fire Code specifications. See Exhibit 269.
     i.      Parking garage does not meet clearance limits. See Exhibit 270-273.

f.     Undisclosed defects:
     a.  Damaged Fire protection system. See Exhibit 179-202, page 12 of 167.
     b.      Damaged HVAC system. See Exhibit 179, 203-204.
     c.      Defective Roof system. See Exhibit 245-264
     d.      Moisture/mold problem. See Exhibit 294-297
     e.      Flooding problems and concerns. See Exhibit 213-225.
     f.      56 defects in the building's waterproofing. See Exhibit 179 and 301-308.
     g.      Perpetual wetland mitigation land. See Exhibit 232-244.

      h.      Building continues to settle due to missing rebar. See Exhibit 160-161
      i.      Structural settlement caused pipes to twist/fracture. See Exhibit 205-206
      j.      Numerous leaks in plumbing and sanitary pipe system. See Exhibit 167
      k.  Floors sag throughout building; Drainage problems. Exhibits 146-159.
      l.      Balconies slope inward. Ponding water problems. See Exhibit 167-169.
      m.     **Plaintiffs' ceiling** unlevel with a 1" difference in 8' span. See Exhibit 180.

Blackerby and Durden were present at all the meetings when these deficiencies and defects were discussed, and they were also part of all the email chains of the same. Durden and Blackerby even hired a construction consultant, GCCI, prior to Plaintiffs closing on the Unit, to formulate a plan for a lawsuit against the architect, engineers and contractors at the Project. GCCI was also hired to detail all the defects and deficiencies, formulate a plan to demand payment from the subcontractors, and to work in conjunction with Defendants' attorneys to get the most in settlement from all the subcontractors for the substantial damage at the Project. Because there were so many structural, design and construction defects and deficiencies at the Project, Defendant Paradise Shores of Bay County, LLC, **after Plaintiffs closed on the Unit**, filed suit against the architects, engineers and contractors of the Project for design, structural and construction defects.

Defendants and their agents have admitted in numerous exhibits, documents and deposition testimony that the Project is **defective**, is **"Tainted"**, and will sell for substantially less than competing complexes due to the defects. Defendants discussed and planned on suing the architect, engineers and contractors seven (7) months prior to closing on Plaintiffs' Unit. However, Defendants waited to sue until they could close as many units at the Project as possible. Only 12 of the 47 units at the Project actually closed as 10 buyers canceled their contracts for failure to timely complete. **Defendants bought back two (2)**

**units from buyers**, dropping the number of units sold to 10 out of 47 units.   Before Defendants filed suit, insurance policy limits were demanded on the architect, engineers and contractor for these design, structural and construction defects.   Estimates of damages at the Project exceeded $5,000,000.00.   Blackerby and Durden were in charge of this litigation and attended all meetings wherein they planned their lawsuit.   Blackerby and Durden hired GCCI as their consultant, and hired the attorneys for their lawsuit against the architect, engineers and subcontractors.

The Project was so unsafe that on August 11, 2006, one subcontractor refused to return to the site for fear of a complete collapse of the building.   See Exhibit 39.   Instead of trying to fix the Project properly, and instead of disclosing to the buyers, Defendants attempted "far fetched" structural fixes that had never been tried before.   See Exhibit 60. Throughout the Project the engineers and contractors failed to put sufficient rebar in the concrete.   As a result, the building bows and deflects.   The building slabs are also way too thin because the building as specified exceeded the Mexico Beach building height limit. Blackerby and Durden admit in exhibits that there are major deficiency issues at the Project both before and after the Plaintiffs closed on their Unit.

Despite all the defects, and material facts that would affect the value of the Unit and the Project, and plans in operation to sue the architect, general contractor and engineers at the Project, Defendants admittedly failed to disclose the same to Plaintiffs.

Defendant Paradise Shores of Bay County, LLC recently sold the Project for "pennies on the dollar" to avoid paying any type of judgment to Plaintiff.   This is further evidence that all the Defendants should be held personally liable in this action.

This is not your typical case of buyer remorse where the Plaintiffs are trying to get out of a contract before it closes.  The Plaintiffs already closed on the Unit.  This is also not a case where there are one or two things wrong with the complex, there are hundreds of defects and deficiencies at this Project, many of them structural in nature, with substantial long-term ramifications.  Paradise Shores, LLC brought suit on these same defects and deficiencies in a State Court action in Bay County and were paid substantial sums of money for these defects and deficiencies.

Plaintiffs have filed contemporaneously with this Motion a Statement of Material Facts containing 99 paragraphs identifying each and every material fact, defect and deficiency, and explaining the link of the Defendants being one and the same, including being the lender of the Project, and the ones in charge of covering up the deficiencies.  Plaintiffs have also filed 351 Exhibits that support their Motion and show that Defendants not only failed to disclose, but that they intentionally failed to disclose in complete and total disregard of Plaintiffs and their safety, and the safety of all other purchasers and prospective purchasers.  Although lengthy and thorough, all exhibits submitted to the Court are relevant to show liability against all of the Defendants.

Maybe the most telling part of this case is when a representative of Paradise Shores, LLC and Magnum Capital, called the Plaintiffs and offered to buy back their Unit, admitting substantial defects and deficiencies at the Project.  The developers also  feared for Plaintiffs' health and safety, and that of their tenants.  All owners and tenants were instructed to evacuate their units and the Project due to structural issues, water intrusion, mold issues and other defects and deficiencies.  During this time period, Blackerby and Durden told Magnum

Capital and Paradise Shores to "kill the Paradise Shores website", and it has not been up since.   Defendants have not listed any of the remaining 36 units for sale over the past two years.

III.   **DEFENDANTS**

Defendant **PARADISE SHORES OF BAY COUNTY, LLC** ("Paradise Shores, LLC") is a developer of the Project and Unit.  See Exhibits 106 - 114.

Defendant **MAGNUM CAPITAL, LLC** ("Magnum") is a developer of the Project and Unit. The front page of the Prospectus shows that Magnum Capital is the developer. See Exhibit 117.  Page 84 of Durden's deposition transcript states Magnum Capital was paid a $757,217.00 developer fee for the Project. See Exhibit 120.  Invoices and correspondence from Magnum prove that Magnum is and was a developer of the Project.  See Exhibits 121-124.  An agreement with the structural engineering regarding structural defects at the Project was signed by Blackerby of Magnum as Developer.   See Exhibit 126.   There was correspondence from Magnum as Developer to the Plaintiffs both prior and subsequent to Plaintiffs' closing.  See Exhibit 116.  Other exhibits show that Magnum was a developer of the Project. See Exhibits 118, 125, 288 - 291.

Defendant **ROBERT E. BLACKERBY** ("Blackerby") is a developer of the Project and Unit.  Page 5 of the Prospectus states:

> "Robert E. Blackerby is responsible for all facets of the development for Paradise Shores, including construction activities, development activities, and sales and marketing activities.  He is the principal directing the creation and sale of the project."   See Exhibit 288.

Mr. Blackerby signed the Deed conveying title in the Unit to Plaintiffs.    See Exhibit 3. Blackerby helped finance the Project and was the original managing member of Paradise

Shores, LLC before conveying a one-half (1/2) interest to Durden.  Blackerby then conveyed his one-half (1/2) interest in Paradise Shores, LLC to his wholly owned company, MH I, limited liability company.   See Exhibit 127-129.   Blackerby is managing member of Magnum Capital.  See Exhibit 115.

Defendant **MH I, Limited Liability Company** ("MH I"), was a managing member of Paradise Shores, LLC at the time of conveyance of the deed to Plaintiffs (Exhibit 3), is wholly owned and operated by Blackerby, and signed the deed conveying title to the Unit to Plaintiffs.   See Exhibits 3, 127-129.

Defendant **DURDEN ENTERPRISES II, INC.** ("Durden Enterprises II"), is the current and sole managing member of Paradise Shores, LLC. See Exhibit 143-144. Durden Enterprises II, Inc. was formerly known as Rail Management Corporation, owned and operated by Kedrick Earl Durden.  Durden Enterprises II, Inc., in addition to Blackerby and Durden, financed the Project and Unit.   Rail Management signed the Condominium Declaration on April 12, 2007 as lender of the Project.  <u>See</u>, Exhibits 132-134, 136, 145. Durden Enterprise II, Inc. profited $303,970.00 from the sale of Plaintiffs' Unit.   See Exhibits 140-141.

Defendant **DURDEN ENTERPRISES, LLC** ("Durden Enterprises") was a former member of Paradise Shores, LLC, and was dissolved by Defendant Durden on February 25, 2010.  See Exhibit 130-131.

Defendant **KEDRICK EARL DURDEN** aka **K. EARL DURDEN** aka **EARL DURDEN**, was in charge of the Paradise Shores project as Managing Member, Lender, and Developer.   See Exhibits 106-114, 132-134, 145.   Earl Durden signed the settlement

statement at closing of the Unit.  See Exhibit 4.  Durden and his companies profited from the sale of the Unit.   See Exhibits 140-141.  Durden pushed for expedited completion of the Project, despite the defects, because he and his company Durden Enterprises II, the lender arm, were concerned about losing millions of their $17,000,000 investment if units did not close.  See Depo Durden, Exhibit 349 at pages 21-23, Exhibit 350, pages 78-80.

## IV.	STANDARD FOR SUMMARY JUDGMENT

Summary judgment should be granted when a party can show that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.   F.R.C.P. 56(c); Celotex Corp v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed.2d 265 (1986). A fact is "material" if it might affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254, 106 S.Ct. 2505, 2513, 91 L.Ed. 2d 202 (1986).   Whether a fact qualifies as "material" hinges on the substantive law at issue. Disputes over irrelevant or unnecessary facts will not defeat a motion for summary judgment.  Scott v. Harris, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L. Ed. 2d 686 (2007). Judgment is appropriate "as a matter of law" when, in the absence of a genuine issue of material fact, the moving party should prevail.  Edwards v. Aguillard, 482 U.S. 578, 595, 107 S.Ct. 2573, 96 L. Ed. 510 (1987).

## V.	LEGAL ARGUMENT

### A.	FAILURE TO DISCLOSE – COUNT I

The Supreme Court of Florida specifically holds:

> "… where the seller of a home knows of facts materially affecting the value of the property which are not readily observable and are not known to the buyer, the seller is under a duty to disclose them to the buyer.  This duty is

equally applicable to all forms of real property, new and used." Johnson v. Davis, 480 So.2d 625, 629 (Fla. 1985).

In Johnson, the Plaintiffs filed a complaint alleging breach of contract, fraud and misrepresentation, and sought rescission of the contract based on roof related problems and defects. The Court allowed rescission of the contract and further awarded Plaintiffs their costs and attorney fees.

In Anchor Bank v. Conrardy, 763 So.2d 360 (Fla. 4th DCA 1998), the Court held, *inter alia*, that the Plaintiff buyer was entitled to **rescission** based on the developer-seller's failure to disclose material facts in the purchase of a condo, even though Plaintiff had an adequate remedy at law.   The Court in Anchor Bank cited the holding in Johnson stating that an action in rescission was properly maintained in tandem with a claim for non-disclosure of material facts in the sale of a dwelling.

Defendants Paradise Shores, LLC, Magnum and Blackerby, are all listed as developer of the Project and Unit. See Exhibits 106-114, 116-118, 120-126, 288-291. Blackerby signed the Deed to Plaintiff as Manager of Paradise Shores.  See Exhibit 3. Defendant Paradise Shores, LLC, Blackerby and Magnum are also developers of the Project pursuant to F.S. Section 718.103(16).

There are hundreds of Exhibits submitted by Plaintiffs in conjunction with this Motion for Summary Judgment that should have been disclosed to Plaintiffs prior to their purchase.  There are numerous material facts that should have been disclosed to Plaintiffs prior to the closing on the Unit as stated in Plaintiffs' Statement of Material Facts.  The evidence is overwhelming.  It is not just one or two deficiencies as in Johnson and Anchor

Bank, which resulted in judgment, Plaintiffs are showing the Court countless material problems and deficiencies at the Project.

The exhibits submitted by Plaintiffs are and can only be appreciated by a thorough examination of the Statement of Material Facts, and the Notice of Filing of Documents by Plaintiffs in support of their Motion for Summary Judgment.   Plaintiffs incorporate by reference into this Motion their Affidavits, their Statement of Material Facts, and the Exhibits filed with the Motion.

Despite all the Defendants being aware of these defects prior to closing of the Unit, all Defendants failed to disclose the defects to Plaintiffs.   This Project started out as one big fraud, wherein Magnum Capital defrauded the County by submitting a boilerplate Threshold Plan (actually a letter) that was never approved by the Threshold Engineer.   See Exhibits 207-208, Depo Threshold Inspector at pages 3 and 4. The fraud, deception and concealment continued to snowball.   To date, a final threshold inspection has never been conducted, the building has never been signed off as complete in violation of Florida Statute, Defendants fired the inspector and never hired another.   See page 2 of Exhibit 207 and Exhibits 209-210.   Durden and Blackerby were forewarned by their own independent structural engineer hired to inspect the Project two (2) months prior to Plaintiffs' closing that the Threshold Plan for the building was in violation of Florida Statutes as follows:

> "Finally, we note that the threshold plan apparently written by the threshold inspection service rather than by the structural engineer of record.  We believe this is a violation of law, as it is our understanding that only the structural engineer of record has the necessary knowledge to write the threshold plan for a building which he has designed."  See last paragraph of Exhibit 71.

The structural engineer never signed off on the Project, and certainly did not sign off on

the Project prior to Plaintiffs closing on the Unit.

Defendants, by their own admissions in exhibits, show that many of these deficiencies still exist at the Project, for example:

a.      As of the date of this Motion, Plaintiffs have not received a clean bill of health regarding the building and have not been assured by Defendants that all mold is gone and/or the building is fit for occupancy.  See moisture/mold units in Exhibits 167, 295-297, 309-310, 312-314, 316-320 and 332-336.

b.      Durden's attorney, Mr. Dow T. Huskey, on July 23, 2009, wrote:

> "The reports provided by these companies detail construction deficiencies with respect to the roof system, exterior façade, mechanical systems and interiors…. As a result of these deficiencies, the various owners of this condominium project have suffered and continue to experience significant damages including, but not limited to, a diminution in the value of the development and its individual units." See Exhibit 337.

c.      In his September 23, 2009 letter, Durden's agent wrote:

> "In addition, the owners have experienced significant damages arising from the construction deficiencies, which include, but are not limited to, loss of rental income, loss of income from sales of units, damage claims by unit owners, damage claims by renters of units, claims of Paradise Shore of Bay County, LLC and the diminution in value of the entire project and units located therein."  See Exhibit 338.

d.      Defendant Paradise Shores, LLC even acknowledged in their Bay County Lawsuit Complaint that the defective construction resulted in a loss of use and a diminution in value of the Project.  See, page 7-8, section 36, of Exhibit 16.

e.      A Durden Enterprises II e-mail, dated September 15, 2009, reveals that "the assessed values for 2010 will be significantly reduced, due to the mold issues," and another e-mail, dated November 2, 2009, assumed "[a]t least a 50% reduction in property taxes due

November 2010, due to mold issues."  See Exhibit 339-340.

f.     **Blackerby** sent a letter to Plaintiffs on behalf of Paradise Shores, LLC on **Magnum letterhead** and dated **October 20, 2009** stating that **"we are all in the same boat" regarding the defects and "rest assured we will act immediately to protect the value and long-term structural integrity of Paradise Shores" to "ensure the homeowners at Paradise Shores are made whole."**  Exhibit 341.

g.     When Durden was asked in his deposition about the Project, he responded: "[i]t's a liability; it is not an asset." See Exhibit 345.

h.     Blackerby admits that the roof is still not repaired to specification as of February 14, 2008.  See Exhibit 253-254.

i.     Blackerby informs Durden on August 7, 2009 talking about wanting a solution to the defects and safety issues at the complex for the homeowners:  **"They can't rent, sell, or live in their homes right now."**  See Exhibit 330.   On August 1, 2009, Blackerby informs Durden stating: **"the bottom line is that we have major problems at Paradise Shores."**  See Exhibits 329.

i.     On May 21, 2008, Defendants' litigation agent, GCCI, states: "the following repairs are still required and have been a problem since construction: water leaking, smoke detectors, common area h2o proofing not completed on 2 floors and many other problems."

These material facts were and are adverse to Plaintiffs, and to any prospective purchaser of a unit at the Project, and as a result, Plaintiffs do not desire the Unit, and would not have desired to purchase the Unit had they known of these material facts.  None of these

material facts were readily observable to Plaintiffs, and were not known to Plaintiffs at the time of closing of the Unit.  Plaintiffs would not have closed on the Unit had these material facts been disclosed by Defendants.  See Exhibit 2, Affidavits of Plaintiffs.

1.      **BLACKERBY AND DURDEN ARE PERSONALLY LIABLE**

The case of Orlovsky v. Solid Surf, Inc., 405 So.2d 1363, 1364 (Fla 4th DCA 1981), holds that individual officers and agents of a corporation may be held personally liable for their tortuous acts, even if such acts were committed within the scope of their employment as corporate officers.  The Court in Ramel v. Chasebrook Construction Company, Inc.,135 So.2d 876 (Fla. 2nd DCA 1961) found the seller's corporate officer individually liable for failure to disclose material facts about the condition of property in a real estate purchase and sale transaction.

Other Florida cases hold that individual officers and owners can be individually liable for their tortuous acts.  E&A Produce Corporation v. Olmo, 864 So.2d 447 (Fla. 3rd DCA 447); Derf Cattle Company v. Colpac International, Inc., 463 So.2d 430 (Fla. 3rd DCA 1985) (one acting as a corporate representative does not insulate him from individual liability for his tortuous acts).

In the event this Court grants summary judgment based on Count I (Failure to Disclose), Count II (Fraudulent Concealment) or Count III (Fraudulent Omission), then Blackerby and Durden must be held personally liable because they were the sole owners, officers, members, managers, agents of the developer.  Moreover, Durden's company, Durden Enterprises II, Inc., financed the entire Project and called the shots on what material facts, if any, would be corrected.

Blackerby personally committed the tort.   Not only did Blackerby hold himself out as the developer of the Project through the Prospectus and other exhibits, but he signed the deed conveying interest in the Unit to Plaintiffs, knowing all of the material facts yet failing to disclose any of them to Plaintiffs.

Page 5 of the Prospectus specifically states:

> **"Robert E. Blackerby is responsible for all facets of the development process for Paradise Shores, including construction activities, development activities, and sales and marketing activities.   He is the principal directing the creation and sale of the project."**

Not only is Blackerby the developer, but he is in charge of construction, marketing and sales of the Project as well.   All correspondence to Plaintiffs was through Blackerby and his company, Magnum Capital.   Moreover, Florida Statutes §718.103(16) defines the developer as:  "the person or entity that created the condominium as a legal entity or (2) that offered or sold the units."   Blackerby by his own admission has done all of this.   Additionally, he was the "Construction Manager" of the Project, and was paid a salary for said position.  See Exhibit 290.  Prospectus for Paradise Shores Condominium See Exhibit 288.  Deposition Transcript of Durden.  See page 4 of Exhibit 350.

Durden signed the settlement statement at closing of the Unit.  The money from the closing went to his companies – Paradise Shores, LLC, and thereafter to pay down the note to Rail Management Company, the company that financed the Project.   Durden was an active participant in being an owner, a managing member, the lender and the signatory on Paradise Shores, LLC documents.  The Material Facts reveal that, along with Blackerby, Durden was at all the meetings, was present when all the deficiencies were discovered, decided what deficiencies would be attempted to be fixed, what deficiencies would be

covered up with paint and caulk.  Durden and his companies received the majority of the money from the sale of the Unit.

### 2.     MH I and DURDEN ENTERPRISES II, INC. ARE LIABLE

Ramel v. Chasebrook Construction Company, 135 So.2d 876, states that multiple corporations in a development of real property are jointly and severally liable for all acts of either company, even without the need to pierce the corporate veil.

Here, Robert Blackerby, as manager of MH I, who was managing member of Paradise Shores, LLC, signed the deed conveying title to the Unit to Plaintiffs.  Blackerby and his company MH I are jointly and severally liable for all torts committed against Plaintiffs pursuant to Ramel.  MH I was an active participant in the Project.  See Exhibit 348.

**On July 10, 2005, Blackerby signed the Purchase and Sale Agreement for the Unit**.  At the time, he was the sole managing member of Paradise Shores, LLC.  Needing money, after the Agreement was signed, Blackerby brought Durden into the Project and Durden was conveyed the other half of Paradise Shores, LLC, and then Durden became the funding arm of the Project.  On December 7, 2005, Blackerby then sold his one-half (½) interest in Paradise Shores, LLC to his wholly owned holding company, MH I, limited liability company, to attempt to avoid future liability.  Blackerby remained as manager of Paradise Shores, LLC after the assignment.

Durden Enterprises II, formerly known as Rail Management Corporation, is now the Managing Member of Paradise Shores, LLC.  Rail Management Corporation, a company owned by K. Earl Durden, acted as lender and, in addition to Durden and Blackerby,

financed the Paradise Shores project.  On January 26, 2009, Rail Management Corporation changed its name to Durden Enterprises II, Inc.  See Exhibit 142.  Prior to this transaction, Durden Enterprises, LLC was a Managing Member of Paradise Shores, LLC.  K. Earl Durden owned and operated Durden Enterprises, LLC.  K. Earl Durden and Durden Enterprises had full knowledge of everything that transpired at the Project.  K. Earl Durden dissolved Durden Enterprises on February 25, 2010.  Durden Enterprises II, Inc. then became the sole member of Paradise Shores, LLC.

Based on the <u>Ramel</u> case, MH I and Durden Enterprises II, Inc., and their representatives, Blackerby and Durden, are jointly and severally liable for all tortuous acts committed against Plaintiffs based on their active and primary involvement in the Project. <u>Ramel</u> at 883.

Durden even admits in his deposition that **Paradise Shores had no employees** and that Rail Management Company (now Durden Enterprises II) paid the bills and expenses associated with the Project, including the development fee to Blackerby and Magnum, further showing that these individuals and companies are liable for their active participation, and that **Paradise Shore, LLC was a mere shell of all these individuals and companies**. See Exhibit 350 Depo Durden at pages 84, 86-88.

### B.     FRAUDULENT CONCEALMENT – COUNT II

The Court in <u>Johnson</u> also found that the seller fraudulently concealed material issues with the roof and therefore Plaintiffs were entitled to their costs, interest and attorney fees under this theory as well.  <u>Johnson</u> at 629.

The Court in <u>Johnson</u> discussed the differences between failure to disclose, concealment, and misrepresentation, and them actually being the same:

> "In theory, the difference between misfeasance and nonfeasance, action and inaction is quite simple and obvious; however, in practice it is not always easy to draw the line and determine whether conduct is active or passive. That is, where failure to disclose a material fact is calculated to 'induce' a false belief, the distinction between concealment and affirmative representations is tenuous. Both proceed from the same motives and are attended with the same consequences; both are violative of the principles of fair dealing and good faith; both are calculated to produce the same result; and, in fact, both essentially have the same effect."

Thus, <u>Johnson</u> tells us that it does not matter whether the fraud is in the form of a failure to disclose, concealment, or in the form an affirmative misrepresentation. The result is the same. Plaintiff is entitled to rescission, costs, interest and attorney fees.

As stated in the Failure to Disclose Count, there are numerous documents and material facts that Defendants Paradise Shores, LLC, Magnum and Blackerby concealed from Plaintiffs prior to the closing of the Unit which Defendants were required by law to disclose. <u>See</u>, <u>Johnson</u> and <u>Anchor Bank</u>. These deficiencies still remain, were attempted to be covered up by paint and caulking (See Exhibits 146-166, 168-179, 346) and as shown in the Material Facts and Exhibits were concealed.

### C.    FRAUDULENT OMISSION of MATERIAL FACTS – COUNT III

The case of <u>Stev-Mar, Inc. v. Matvejs</u>, 678 So.2d 834, (Fla. 3rd DCA 1996), provides a framework for fraudulent misrepresentation based on omission. In <u>Stev-Mar, Inc</u>., the seller of real property was made aware that she needed to disclose certain material facts to the buyer. The seller did not and the Court stated that the fraudulent misrepresentations of seller by omission was a substantial factoring determining buyer's course of conduct in

buying the property.  Stev-Mar, Inc. at 839.

In the case at bar, in addition to the plethora of material facts that should have been disclosed by Defendants referenced above, Defendants were instructed in writing by their own attorneys of two material facts that needed to be disclosed to buyers.   The first material fact was with respect to wetlands and mitigation property.   See Exhibits 232-242, 243-244. The Army Corp of Engineers issued a "cease and desist order" for wetland violations by Defendants during construction.   See Exhibit 232.   Because of the violation, Paradise Shores, LLC was required to provide 2.0 acres of off-site mitigation property in perpetuity. Because this would eventually be a cost to the owners of the units at the Project through homeowner's association dues, Magnum Capital asked their attorney whether this needed to be disclosed to the buyers.   The attorney answered: **"Yes."**   See Exhibit 243. An internal email from Diane Butcher (the same Diane Butcher that submitted the fraudulent Threshold Plan/Letter to the County before construction began) of Magnum to Robert Blackerby states: **"We will have to disclose whatever we decide to do to the purchasers at closing."**  This was never disclosed to Plaintiffs despite Blackerby being told on two separate occasions to disclose.

The other was when the Project flooded during construction and Defendants asked whether this needs to be disclosed.  Defendants' attorney responded as follows:  "There are a few cases suggesting that the propensity for a home to flood may be a latent defect, thus requiring disclosure before closing."  See Exhibit 218.   This disclosure was never made to Plaintiffs even though Defendants knew the Project had a propensity of flooding.

**D.      NEGLIGENCE CLAIMS – COUNTS IV, V and VI**

In the case of <u>Billian v. Mobil Corporation</u>, 710 So.2d 984 (Fla. 4th DCA 1998) the Court explained how the failure to disclose standard was different than fraudulent misrepresentation, and cited the <u>Johnson</u> case in explaining the distinction.  The <u>Billian</u> case went on to state that the standard in Johnson is similar to that of **"negligence"** and **"negligent misrepresentation."**  <u>Billian</u> at 988 and 989.  Quoting <u>Billian</u>:

> "Significantly, Johnson casts the cause of action in term of "duty," a concept drawn from the law of **negligence**.  If the facts of a case give rise to a duty to disclose under Johnson, the seller's state of mind motivating the failure to disclose is immaterial; the forgetful or unsophisticated seller is just as liable as the knowing dissembler." <u>Billian</u> at 988.

> Johnson carved out of the law of fraud a unique place for non-disclosure cases involving the sale of a home.  A traditional cause of action for fraud turns in large part on the state of mind of the tortfeasor.  For example, in a fraudulent misrepresentation case, a plaintiff must prove that a defendant knew a statement was false or that the defendant made a statement knowing he was without knowledge of its truth or falsity; in addition, the plaintiff must demonstrate that in making the false statement, the defendant intended that another rely on it. <u>Billian</u> at 988.

> Unlike the cause of action for fraudulent misrepresentation, a non-disclosure case under <u>Johnson</u> does not focus on the seller's state of mind motivating the non-disclosure.  <u>Johnson</u> creates a duty to disclose where a seller knows of certain facts under circumstances giving rise to the duty.  The factfinder is not required to delve into the murky area of a seller's intent underlying the non-disclosure.  In this regard, the state of mind requirement under <u>Johnson</u> is analogous to that in a **negligent misrepresentation** case, where one who "supplies false information" exposes himself to liability if "he fails to exercise reasonable care or competence in obtaining or **communicating the information**." <u>Gilchrist Timber Co. v. ITT Rayonier, Inc.</u>, 696 So.2d 334, 337 (Fla. 1997) (quoting Restatement (Second) of Torts §552 (1977)).  The practical effect of Johnson is to encourage disclosure in those transactions where a seller might be in doubt as to whether a set of facts should be revealed to potential buyers." <u>Billian</u> at 988 and 989.

There is no doubt that the Defendants were negligent and committed negligent

misrepresentation when they failed to disclose all the material facts to Plaintiffs as stated in the Material Facts and as referenced above.

The standard for gross negligence is higher than negligence and negligent misrepresentation, but the end result is the same for these Defendants.   Florida law defines "gross negligence" as "an act or omission that a reasonable, prudent person would know is likely to result in injury to another."   In re PSN USA, Inc., 426 B.R. 916, 922 (Bankr. S.D. Fla. 2010).

In the case at hand, in addition to the Material Facts submitted by Plaintiffs, and the plethora of material facts that should have been disclosed referenced above, the Defendants on two occasions were specifically instructed in writing to disclose the (1) mitigation property cost; and (2) flooding.   These two instances show reckless disregard of Plaintiffs even when Defendants were charged with knowledge and informed to disclose, yet still failed to disclose.   Pursuant to the case law cited above, all Defendants are charged with liability.

### D.       BREACH OF CONTRACT – COUNT VII

The Addendum to the Purchase and Sale Agreement for the Unit requires Defendant Paradise Shores, LLC to construct the Project and Unit according to the Plans and Specifications, and to build free of defects and workmanship and materials.   By Paradise Shores own admission in the lawsuit against the architect and engineers, the pleadings in that case state that the Project was not built according to plans and specifications, had multiple design defects and construction defects, and was not built in a workmanlike manner.   See   Case No. 2008-CA-1491, *Paradise Shores of Bay County, LLC v. Taylor*

*Architects, et al.,* Bay County Circuit Court, Florida (the "Bay County Lawsuit"). See Exhibit 16.   The Prospectus, which is a part of the contract documents, requires the "Condominium to be built in compliance with all applicable building codes and ordinances that such improvements be of high quality that is consistent with good construction and development practices for similar project.  See Exhibit 292.  Paradise Shores, LLC breached it agreement with Plaintiffs, for which Plaintiffs have suffered, and will continue to suffer substantial damages which include, without limitation, the following:  loss of value of the Unit as evidenced to the recent fire sale of 36 units for $5,000,000 (See Exhibit 351) in the complex, mortgage payments, taxes, homeowner's association payments, insurance payment, attorney fees, costs, and interest.

### F.       RESCISSION – COUNT XI

The cases of <u>Johnson</u> and <u>Anchor Bank</u> tell us that rescission is the remedy when a seller-developer fails to disclose facts materially affecting the value of the property which are not readily observable and are not known to the buyer. <u>Johnson v. Davis</u>, 480 So.2d 625, 629 (Fla. 1985).

In <u>Johnson</u>, the Plaintiffs filed a complaint alleging breach of contract, fraud and misrepresentation, and sought rescission of the contract based on roof related problems. In <u>Anchor Bank v. Conrardy</u>, 763 So.2d 360 (Fla. 4th DCA 1998), the Court held, *inter alia*, that the Plaintiff buyer was entitled to rescission based on the developer-seller's failure to disclose material facts in the purchase of a condo, even though Plaintiff had an adequate remedy at law.   In those cases, there were a few issues that should have been disclosed, and both Courts held in favor of Plaintiffs, granting rescission, interest, costs and attorneys fees.

In the case at bar, we are dealing with hundreds of material facts and documents that should have been disclosed to Plaintiffs.  The evidence submitted is so overwhelming, and the failure to disclose and concealment is so egregious that the Court should award rescission to Plaintiffs, including all their costs, interest and attorneys fees.  See Material Facts, Exhibits and Affidavits of Plaintiffs in Exhibit 2.

**WHEREFORE**, Plaintiffs respectfully requests the following:

1.      Summary Final Judgment be entered against the Defendants pursuant to the Counts referenced in Section I above.

2.      That Rescission be granted to Plaintiffs, that Plaintiffs be returned their down payment, all their expenses, interest, insurance fees, homeowner's association fees, taxes, mortgage payment fees, costs and attorneys fees.

3.      Punitive damages against all Defendants to be determined at hearing based on Defendants willful, wanton and reckless acts and omissions against Plaintiffs, to ensure that this does not happen to any other innocent purchasers.

4.      Such other and further relief as this Court deems just and proper.

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished to: Michael Schofield, Esq., at mschofield@cphlaw.com and Stuart Poage, Esq. at sp@kubickidraper.com by electronic filing this 21st day of January 2011.

/s/ Jeffrey M. Stephens
Jeffrey M. Stephens, FL Bar No. 969710
Stephens Law Firm, P.A.
4507 Furling Lane, Suite 210
Destin, FL  32541
(850) 837-7135; Fax:   837-1969
Email: stephenslaw@mac.com
Attorneys for Plaintiffs