IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

JOSHUA S. FRIEBEL and
ELIZABETH F. FRIEBEL,
husband and wife,

    Plaintiffs,

vs.                                                      CASE NO. 5:10-cv-120/RS-EMT

PARADISE SHORES OF BAY COUNTY,
LLC, a Florida limited liability company;
ROBERT E. BLACKERBY, an individual;
MAGNUM CAPITAL, LLC, a Florida limited
liability company; DURDEN ENTERPRISES
II, INC., a Delaware corporation; DURDEN
ENTERPRISES, LLC, a Florida limited
liability company; ESTATE OF KEDRICK
EARL DURDEN; MICHAEL EARL DURDEN,
as Personal Representative of the Estate of
Kedrick Earl Durden; and MH I, LLC, a Florida
limited liability company,

    Defendants.
_____/

**AMENDED ORDER REFLECTING CHANGES IN SECTION ON "MR. SCOTT"**

    Before me are Defendants' Motions to Strike (Docs. 269 & 270) and Plaintiffs' Response in Opposition (Doc. 296).

## Procedural History

    The judiciary has thankfully moved to electronic docketing, otherwise, scores of trees would have perished for the sake of this over-litigated case. Nearing our 300th docket entry, the issues surrounding these motions began with entry number 82, the Scheduling and Mediation Order. That order set the discovery deadline as March 25,

2011, and adopted the Amended Report of Rule 26(f) Planning Meeting (Doc. 79) which set January 25, 2011, as the deadline for Plaintiffs to disclose expert witness and reports. It also set a March 3, 2011, deadline for the disclosure of rebuttal experts. *Id.* Plaintiffs made timely disclosure of two experts—James Mehltretter for Plaintiff's case in chief, and Gerald Scott as a rebuttal witness (Doc. 296, Attach. 1; Doc. 296, p. 2-3).

Following the close of discovery, Defendants filed their second set of Motions for Summary Judgment (Docs. 192 & 235) in April and May 2011, respectively. Plaintiffs responded (Doc. 227) and also filed a Motion for Summary Judgment (Doc. 240). In conducting a preliminary review of the record, I found that Plaintiffs had not come forth with expert testimony for the cost to repair the condominium unit at issue. Further, I found that the reliability of the rebuttal expert's methods were questionable. I ordered the parties to supplement their motions to address these concerns (Doc. 242). This Order did not alter the discovery deadline or the requirements for disclosure of expert testimony (*See* Doc. 271).

In response to the Order, Plaintiffs "supplemented" Messrs. Mehltretter and Scott previous reports by including additional information not originally disclosed (Doc. 267). It is the content of the new information that is in dispute here.

## Analysis

### Mr. Mehltretter

Parties must disclose the identity of all expert witnesses at least 90 days before trial. Fed. R. Civ. P. 26(a)(2)(A); *Id.* at (a)(2)(D). This disclosure must be accompanied by a written report that contains, among other things, "a complete statement of all

opinions the witness will express and the basis and reasons for them, . . . and the facts or data considered by the witness in forming them." *Id*. at (a)(2)(B). "The intention is that 'facts or data' be interpreted broadly to require disclosure of any material considered by the expert, from whatever source, that contains factual ingredients." Fed. R. Civ. P. 26 advisory comm. n.

Plaintiffs' disclosure of Mr. Mehltretter stated that he would "testify regarding the project being structurally deficient and . . . that these structural and design deficiencies should have been disclosed to the [Plaintiffs], and that the structural and design deficiencies and conditions affect the value of the property." (Doc. 296, Attach. 1, p. 2). While Mr. Mehltretter's report thoroughly catalogued numerous defects in the condominium project, it did not identify the actual cost to repair the building (Doc. 296, Attach. 1, Exhibit 1).

Parties have a "duty" to supplement expert reports and testimony with any additions or changes in the information provided. Fed. R. Civ. P. 26(e)(2). This must be accomplished within thirty days of trial. *Id*. (referencing time for pretrial disclosures under Rule 26(a)(3). Here, the supplemental disclosure of Mr. Mehltretter was timely. The dispute is whether the information contained in the disclosure was proper.

Rule 26(e) uses the word "duty" because it anticipates parties correcting errors so that their opponents are not mislead. Rule 26(e) is not a blank check to use summary judgment as a discovery tool that can refine and extend an expert's testimony to cover deficiencies uncovered by one's opponent.  "An incomplete report cannot be cured by the use of supplementation. . . Supplementation of an expert report pursuant to Rule 26(e)

does not cover failures of omission because the expert did an inadequate or incomplete preparation." *Whetstone Candy Co. v. Nestle USA, Inc*., 2003 U.S. Dist. LEXIS 27625, 4-5, n.1 (M.D. Fla. 2003) (citation omitted). Rule 26(e) envisions supplementation when a party's discovery disclosures happen to be defective in some way so that the disclosure was incorrect or incomplete and, therefore, misleading. Further, to construe supplementation to apply whenever a party wants to bolster or submit additional expert opinions would reek havoc in docket control and amount to unlimited expert opinion preparation. *Id*. *See also Kanawha-Gauley Coal & Coke Co. v. Pittston Minerals Group, Inc*., 2011 U.S. Dist. LEXIS 9115 (S.D. W. Va. 2011) ("Courts distinguish true supplementation (e.g., correcting inadvertent errors or omissions) from gamesmanship, and have therefore repeatedly rejected attempts to avert summary judgment by supplementing an expert report with a new and improved expert report.").

Here, Plaintiffs made a supplemental disclosure of additional testimony that Mr. Mehltretter would make (Doc. 267, Attach. 1). This disclosure contained a supplemental affidavit in which Mr. Mehltretter stated that he prepared a "scope of repairs" in response to my Order (Doc. 242) which directed the parties to provide additional argument on the issues of damages. Based on Mr. Mehltretter's scope of repairs, "Grant Builders Group, Inc. ("GBG"), a Florida general contractor, was engaged to estimate the repair cost and to provide pricing for the repairs. On May 16, 2011, GBG went to the property site and did an assessment of the cost to repair the defects. On May 21, 2011 GBG provided a cost of repairs." (Doc. 267, Attach. 1, p. 5-6) (punctuation altered). GBG calculated that the cost of repair for the Plaintiffs' condominium unit was $600,313. *Id.* at 17. Mr.

Mehltretter reiterated this repair cost in his affidavit. *Id*. at 6.  This May 24th disclosure was the first instance that a repair cost appeared in the voluminous record.

Because the initial report focused primarily on technical construction defects and contained only one sentence related to value, this information was not a natural extension of the report.  Rather, the cost calculation was taken verbatim from a separate report prepared by Mr. Cryspian Hopper at GBG.  Mr. Mehltretter's initial report did not list Mr. Hopper or GBG as "facts or data" considered in formulating the report.  Likewise, neither Mr. Hopper nor GBG were disclosed as witnesses.  (Doc. 269, p. 3).  For these reasons, the cost of repair should be excluded as not being supplemental disclosure but rather independent information.

**Mr. Scott**

Plaintiffs initially submitted a report prepared by Gerald F. Scott, a state certified general real estate appraiser (Doc. 229, Attach. 2) in March 2011 as a rebuttal witness on the issue of damages.  Mr. Scott formulated the opinion that, because of the stigma of construction defects, the Plaintiff's condominium unit suffers from a "range of loss supported by data between 50 [percent] and 77 [percent]."  This amounts to a loss of $177,500 to $273,300.  *Id*. at 15.

Mr. Scott based this opinion on his "past experience and appraisals of properties . . . with large damages from construction defects . . . ."  He also relied on two Appraisal Institute publications and his own education and experience to perform the impacted valuation study.  This study required the following data: 1) sales and data to support the

un-impacted value of a property; 2) an engineering study to determine the type and extent of damage; 3 contractor's estimate of repairs; 4) an inspection of the property. *Id.* at 12. Mr. Scott noted that he did not have repair estimates at that time and would proceed with a complete analysis study when it became available. *Id.* at 12. In May 2011, Mr. Scott was provided with the cost of repair which was calculated by Mr. Hopper and GBG which allowed him to "complete" his report (Doc. 268, Attach. 3, p.6). Mr. Scott's incomplete analysis cannot be cured at this stage by including Mr. Hopper's untimely cost estimates because of the same reasons set forth for Mr. Mehltretter's report. Testimony regarding the cost of repair will be excluded.

Mr. Scott's report is flawed for a second reason; his methodology does not meet the *Daubert* standards.   In his report (Doc. 229, Attach. 2), Mr. Scott found that the sale price of Plaintiff's property was $354,900 and that there was a known decline pattern in the sales price and valuation in the local market. He noted that he lacked contractor estimates for repair and, therefore, he could not proceed "to a full dollar loss conclusion."

Next, Mr. Scott then detailed an "on going personal case study." In this case study, Mr. Scott is the actual owner of a condominium unit in Sarasota, Florida. This building was 36 years old, and in June 2010 a structural failure occurred on the "fourth floor transfer slab that supports the 12 floors [above]." This structural failure cause the evacuation of the building for such a period that the residents had been forced to live in other accommodations at their own cost. Mr. Scott calculated that there was a 77% decrease in the value of his Sarasota building as a result of these problems. *Id.* at 14-15.

This 77% percent value represents the top-end of Mr. Scott's opinion regarding the Plaintiffs' loss amount.

Mr. Scott then noted that the second basis for loss of value was a July 2003 publication entitled *Construction Defects and Stigma.* It "implies [an] average of 50% loss in property value associated to the stigma related to construction defects in property." This percent value represents the bottom-end of Mr. Scott's opinion regarding the loss amount.

Federal Rules provide that witnesses may testify as experts if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), put forth a two-pronged analysis used to determine the admissibility of the proffered expert testimony on issues under Rule 702.

First, the expert testimony must be reliable, so that it must be "scientific," meaning grounded in the methods and procedures of science, and must constitute "knowledge," meaning something more than subjective belief or unsupported assumptions. *McDowell v. Brown*, 392 F.3d 1283, 1298-1299 (11th Cir. 2004) (citing *Daubert*, 509 U.S. at 590).

Daubert's reliability prong sets out four guideposts that a district court may consider in assessing the reliability of the expert testimony, which include, but are not limited to: (1) whether the expert's methodology has been tested or is capable of being tested; (2) whether the technique has been subjected to peer review and publication; (3) the known and potential error rate of the methodology; and (4) whether the technique has

been generally accepted in the proper scientific community. *Id. (citing Daubert*, 509 U.S. at 593-94; *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999)).  In addition, other factors that a court may consider in the *Daubert* analysis are "reliance on anecdotal evidence, temporal proximity, and improper extrapolation. *Id.* (*citing Allison* at 1312). Finally, a court should meticulously focus on the expert's principles and methodology, and not on the conclusions that they generate.  *Id.*

The second prong of the *Daubert* analysis requires that the proposed testimony be relevant.  To meet this requirement, the expert testimony must be "'relevant to the task at hand,' … i.e., that it logically advances a material aspect" of the case.  *Daubert* at 591. The relevance requirement is not satisfied where the proffered testimony does not assist the trier of fact. Fed.R.Evid.702.

Here, Mr. Scott's report is fatally flawed for two reasons.  First, Mr. Scott does not support his conclusions with the methodology he purports to have used.  Second, the personalized case study which forms the upper loss boundary is unreliable.

Mr. Scott reported that he considered a host of information to conduct an impacted valuation study: sales and data, an engineering study, contractor estimates to repair damages, and inspection of property (Doc. 229, Attach. 2, p. 12).  However, regardless of what steps Mr. Scott purported to have taken to reach his conclusion regarding valuation, the low end of the range came from a 2003 publication and the high end came from his personalized case study (Doc. 268, Attach. 3, p. 4-5).  "A range if loss [is] supported by data between 50% and 77% for the subject property."  (Doc. 229, Attach. 2, p. 15).  Mr.

Scott acknowledged at deposition that this was a "guesstimate." (Doc. 233, Attach. 1, p. 67).

The 2003 publication on which Mr. Scott relies is a study which "illustrates the problems and suggests methods which have been used in recent cases that transcend both the legal and appraisal problems" related to construction defect cases (Doc. 233, Attach. 3, p. 1). The author, John Kilpatrick, presents "alternative methodologies, within the rubric of traditional valuation approaches, for estimating stigma damages in construction defect cases." *Id*. at 2. The method that Mr. Scott purports to use does not appear to be one that was reviewed in the article. Rather, Mr. Scott appears to cherry-pick the 50% reduction in value from the article's section on the "incurable physical depreciation" model. *Id*. at 6-9. However, Mr. Scott does not conduct anything resembling the analysis required for this model such as estimating the economic value of the utility of living in the subject or depreciating the economic utility and discounting it back to the present. *Id*. at 7-8. Further, Mr. Scott's report does not indicate how the sales data, the engineering study, or an inspection of the property supports or refutes the publication.

The second basis for Mr. Scott's loss valuation is a personal case study. Mr. Scott asserts that a 77% decline in value could be attributed to structural defects at a condominium building based on his experience living at Dolphin Tower. His personal study has serious differences from the case at hand. Mr. Scott's Dolphin Tower is in Sarasota, Florida. While Sarasota is on the Gulf coast, it is nearly 400 miles from Mexico Beach. More importantly, the structural issues at Dolphin Towers required evacuation by municipal order and a long-term resettling of owners in other

accommodations. The severity of the issues at Paradise Shores did not require such extreme measures. Other differences include the fact that Dolphin Towers is at least fifteen stories high, not on the beach, and was thirty-six years old. Paradise Shores is a smaller structure, on the beach, and new construction.

Mr. Scott has not explained how the apparent variations between the two situations could result in the same devaluations. Further, Mr. Scott's report does not indicate how the sales data, the engineering study, or an inspection of the property supports or refutes the case study. The situations are so disparate that Mr. Scott's testimony is not "the product of reliable principles and methods." Fed. R. Evid. 702.

Plaintiffs assert that recent sales have no bearing on the valuation at the time of closing (Doc. 301, p.6). This is incorrect as recent sales prices reflect on whether the calculation of a past valuation is accurate.

Mr. Scott's report noted that in January 2011 a bulk sale took place where an investor purchased thirty-six units at an average price of $144,833. In addition, the report noted that four units had been sold by the investor within the five weeks preceding the report and that the sales prices ranged between $140,000 and $300,000. All of the units were sold without any disclosure of defects. (Doc. 229, Attach. 2, p. 9). The remaining units are currently listed for sale between $159,000 and $230,000. There is no indication how the recent sales are similar or different from Plaintiffs' unit. There can be no meaningful comparison without knowing their size, floor plan, view, and height within the building. Without this information, there is no way to validate Mr. Scott's conclusions and ensure that his estimates of valuation fit with what actually occurred.

**IT IS ORDERED:**

1. Defendants' Motions to Strike (Docs. 269 & 270) are **GRANTED**.

2. The new expert affidavits (Doc. 267, Exhibits A & B) are inadmissible.

3. Mr. Scott's report and proposed testimony (Doc. 229, Attach. 2) are inadmissible as failing *Daubert*.

**ORDERED** on June 13, 2011.

/S/ Richard Smoak
**RICHARD SMOAK**
**UNITED STATES DISTRICT JUDGE**